UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIOLETTE JEANNOT, *et al*., | **MEMORANDUM & ORDER** |
| Plaintiffs, | 24-CV-05896 (HG) |
| v. | |
| NEW YORK STATE, *et al*., | |
| Defendants. | |

**HECTOR GONZALEZ**, United States District Judge:

Plaintiffs bring this action against New York State, Governor Kathy Hochul, the New York State Department of Health ("NYSDOH"), and James McDonald, in his official capacity as Commissioner of the NYSDOH, seeking injunctive and declaratory relief. ECF No. 1 (Complaint). Plaintiffs are made up of two groups: (1) individuals who receive home care services through New York State's Consumer Directed Personal Assistance Program ("CDPAP") (the "Consumer Plaintiffs"), under which consumers may hire personal assistants ("PAs") to provide their care, and (2) agencies known as fiscal intermediaries ("FIs") that co-employ the Consumer Plaintiffs' PAs and administratively support the Consumer Plaintiffs and their PAs under CDPAP (the "Agency Plaintiffs"). ECF No. 1 ¶¶ 1–6. Plaintiffs are seeking a preliminary injunction ("PI") enjoining Defendants from implementing a law incorporated into New York's budget for Fiscal Year 2024–2025 that would replace the existing FIs with a single statewide agency (the "Statewide FI") to support the Consumer Plaintiffs under the CDPAP (the "CDPAP Law"). ECF No. 3 (PI Motion). Defendants have moved to dismiss Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 27 (Motion to Dismiss). For the reasons stated herein, Defendants' Motion to Dismiss is granted, and Plaintiffs' PI Motion is denied.

## BACKGROUND[1]

The Complaint alleges that the CDPAP Law violates the Medicaid Statute, 42 U.S.C. § 1396, *et seq.* (the "Medicaid Act"), the Americans with Disabilities Act, 42 U.S.C. § 12132, *et seq.* (the "ADA"), and the Rehabilitation Act, 29 U.S.C. § 794. ECF No. 1 ¶¶ 151–67. Plaintiffs bring their Medicaid Act claims by way of 42 U.S.C. § 1983 ("Section 1983"). *Id.* ¶¶ 151–63. Plaintiffs also assert procedural due process claims pursuant to Section 1983. *Id.* ¶¶ 168–70.

The Medicaid program is a federal-state partnership designed to provide medical assistance to vulnerable populations. *Id.* ¶¶ 56–57. Each participating state operates a state-specific Medicaid program for their citizens that is regulated, overseen, and partially funded by the federal government. *Id.* States are not required to participate in the Medicaid partnership, but those that do must comply with certain statutory and regulatory requirements in the administration of the program. *Id.* ¶ 57. The Medicaid Act sets out certain of these statutory requirements. *Id.* ¶ 58. As relevant to the claims herein, the Medicaid Act requires states to: (1) "provide that all individuals wishing to make an application for medical assistance . . . have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals," 42 U.S.C. § 1396a(a)(8) (the "Reasonable Promptness Provision");

---

[1] Unless otherwise indicated, the facts stated herein are drawn from the Complaint. The Court "recite[s] the substance of the allegations as if they represent[] true facts, with the understanding that these are not findings of the [C]ourt, as [the Court has] no way of knowing at this stage what are the true facts." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021). As explained in more detail in this Order, with respect to the portion of Defendants' motion brought under Rule 12(b)(1), the Court is aware that "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008). However, in considering the portion of Defendants' motion brought under Rule 12(b)(6), the Court has assumed that all well-pled allegations in the Complaint are true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

(2) the medical assistance made available to specified qualified individuals "shall not be less in amount, duration, and scope than the medical assistance made available to" either "any other such individual" or to individuals not specified, *id.* § 1396a(a)(10) (the "Comparability Provision"); and (3) provide that "any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person qualified to perform the service or services required, . . . who undertakes to provide him such services," *id.* § 1396a(a)(23) (the "Freedom of Choice Provision"). *See* ECF No. 1 ¶¶ 58, 128, 134, 151–63.

New York has participated in the Medicaid program since 1966, and has authorized the specific Medicaid program at issue here, CDPAP, for years. *Id.* ¶¶ 68–72. Currently, there are an estimated 246,000 Medicaid beneficiaries in New York who receive CDPAP services. *Id.* ¶ 79. CDPAP is "designed to permit chronically ill and/or physically disabled individuals (referred to as consumers) receiving home care services greater flexibility and freedom of choice in obtaining such services from consumer-selected caregivers, [PAs], and in determining how, where, and when such services are performed." *Id.* ¶ 73. CDPAP allows those enrolled in the program to "self-direct" their services, which means that they "recruit and hire their own PAs, train, supervise, and schedule the PAs, and co-employ the PAs." *Id.* ¶ 75. CDPAP consumers co-employ their PAs with private agencies known as FIs, which help with a variety of largely financial and administrative tasks, including ensuring that PAs are hired and paid in accordance with state and federal labor laws, maintaining appropriate records, and ensuring that appropriate contracts are executed between consumers and their PAs. *Id.* ¶¶ 75–77. According to Plaintiffs, FIs often have local offices and staff in the neighborhoods in which their consumers live, and provide additional benefits, including "peer mentoring and counseling for consumers," visits to

3

the consumer's home, "face-to-face orientation for [PAs]," and other general support for consumers to help them in their role as employers.  *Id.* ¶¶ 78, 82.

The CDPAP Law, which became effective on April 1, 2024, provides for the creation of a single Statewide FI to administer home health services for all consumers in the program and to co-employ PAs with those consumers.  *Id.* ¶¶ 2–11; 91–98.  The Statewide FI will be required to subcontract with at least four other pre-existing FIs that meet specified criteria to administer services.  *Id.* ¶ 95.  Citing to the implementing law, Defendants assert that the Statewide FI is also permitted to subcontract with additional FIs, including ones that do not meet the specified criteria.  ECF No. 27 at 21.[2]  Any FI that does not receive a subcontract "must cease operations on or before April 1, 2025, and must provide at least forty-five days['] advance notice to the affected consumers."  ECF No. 1 ¶ 96.  On September 30, 2024, NYSDOH selected the Statewide FI.  *See* ECF No. 27 at 23.

The Consumer Plaintiffs receive home health services from PAs whom they co-employ with currently existing FIs under the CDPAP.  ECF No. 1 ¶¶ 15–32.  Some of the Consumer Plaintiffs work with their PAs and FI in a language other than English.  *Id.*  The Agency Plaintiffs are New York corporations that each provide FI services in a variety of languages to consumers.  *Id.* ¶¶ 33–55.  Plaintiffs allege that the CDPAP Law and the transition it necessitates of all current CDPAP consumers and PAs to a new Statewide FI violate the Medicaid Act because they:  (1) will prevent the Consumer Plaintiffs from being able to select the specific "care team" that they desire (and the Agency Plaintiffs from being among the FIs that the Consumer Plaintiffs can select to administer their CDPAP benefits); (2) will cause the Consumer Plaintiffs to face unreasonable delay in receiving medical assistance; and (3) will make it more

---

[2]    The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

difficult for the Consumer Plaintiffs to receive the Medicaid services to which they are entitled due to language and cultural barriers. *Id.* ¶¶ 58–60, 128–37. The Consumer Plaintiffs also assert claims under the ADA and the Rehabilitation Act, arguing that the transition required by the CDPAP Law will cause certain beneficiaries to lose their home care services and result in their forced institutionalization because of their disabilities. *Id.* ¶¶ 138–50. Finally, Plaintiffs argue that their procedural due process rights were violated by implementation of the CDPAP Law. *Id.* ¶¶ 168–70. Plaintiffs assert claims for declaratory and injunctive relief, seeking to prevent Defendants from implementing the CDPAP Law. *Id.* at 45.

Around a week after filing their Complaint, Plaintiffs filed their PI Motion. ECF No. 3. Defendants filed their Motion to Dismiss on October 9, 2024. ECF No. 27. Plaintiffs opposed Defendants' Motion to Dismiss on October 23, 2024, ECF No. 28 (Opposition to Motion to Dismiss), and Defendants filed their reply on November 4, 2024, ECF No. 29 (Reply in Support of Motion to Dismiss).

## LEGAL STANDARD

### I.    Subject Matter Jurisdiction

When a party moves to dismiss under Rule 12(b)(1) as well as on other grounds, courts "consider the Rule 12(b)(1) challenge first" because if a court finds that it lacks subject matter jurisdiction, then the defendants' other "defenses and objections become moot and do not need to be determined." *Daly v. Citigroup Inc.*, 939 F.3d 415, 426 (2d Cir. 2019). "A district court properly dismisses an action under [Rule 12(b)(1)] for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms. S.à.r.l.*, 790 F.3d 411, 416–17 (2d Cir. 2015). "A plaintiff asserting subject matter

jurisdiction must prove by a preponderance of the evidence that subject matter jurisdiction exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In considering a motion to dismiss for lack of subject matter jurisdiction, "[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison*, 547 F.3d at 170.  On a motion brought under Rule 12(b)(1), the Court is permitted "to rely on non-conclusory, non-hearsay statements outside the pleadings." *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013).

## II.    Failure to State a Claim

"To survive a motion to dismiss for failure to state a claim [brought under Rule 12(b)(6)], the complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Eliahu v. Jewish Agency for Isr.*, 919 F.3d 709, 712 (2d Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678).  "The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of [p]laintiffs' claims for relief." *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 155 (E.D.N.Y. 2018).  Although all well-pled allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Pursuant to Section 1983, the Consumer Plaintiffs allege claims under three different provisions of the Medicaid Act.  They allege violations of:  (1) the Freedom of Choice Provision, arguing that the CDPAP Law prevents them from selecting their agency of choice to administer

6

their CDPAP services, *see* ECF No. 1 ¶¶ 151–52; (2) the Reasonable Promptness Provision, arguing that the CDPAP Law violates their right to reasonably prompt Medicaid-related services, *see id.* ¶ 159; and (3) the Comparability Provision, arguing that the CDPAP Law violates their right to receive and continue receiving CDPAP services, *see id.* ¶ 162.  The Consumer Plaintiffs also allege that the CDPAP Law violates their right to receive non-institutionalized home care services under the ADA and the Rehabilitation Act, *see id.* ¶¶ 165–67, and also violates their procedural due process rights, *see id.* ¶¶ 169–70.

The Agency Plaintiffs allege two claims, both of which are brought pursuant to Section 1983.  Their first claim alleges that the CDPAP Law violates their right to be included among the agencies that the Consumer Plaintiffs may select to administer their CDPAP services under the Medicaid Act's Freedom of Choice Provision.  *Id.* ¶ 153.  Their second claim alleges that the CDPAP Law violates their procedural due process rights.  *Id.* ¶¶ 169–70.

## I.    Article III Standing

Article III of the U.S. Constitution "limits the jurisdiction of the federal courts to the resolution of cases and controversies."  *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012).  Whether there is a case or controversy "is the threshold question in every case, determining the power of the court to entertain the suit."  *Id.*  "[T]o ensure that this bedrock case-or-controversy requirement is met, courts require that plaintiffs establish their standing as the proper parties to bring suit."  *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 89 (2d Cir. 2009).  If a district court "lacks the statutory or constitutional power to adjudicate" a case because, for example, the plaintiffs "lack[] constitutional standing to bring the action," the case is "properly dismisse[d] under [Rule 12(b)(1)] for lack of subject matter jurisdiction."  *Cortlandt*, 790 F.3d at 416–17.  To satisfy the constitutional requirement of standing, plaintiffs in federal court bear the burden of establishing:  "(1) that they suffered an injury in fact, (2) that the injury is fairly

traceable to [d]efendants' challenged conduct, and (3) that the injury is likely to be redressed by a favorable decision." *Soule ex rel. Stanescu v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 45 (2d Cir. 2023). Plaintiffs "establish[] injury in fact if [they] suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 92 (2d Cir. 2019).

> A.    *The Consumer Plaintiffs*

Defendants argue that the Consumer Plaintiffs do not have Article III standing to bring any of their claims because they cannot demonstrate a concrete injury and their claims are not ripe. ECF No. 27 at 31–34. Defendants refer to the Consumer Plaintiffs' fears that the transition to a single Statewide FI "will prevent them from selecting the PA of their choice, delay their PA services, and lead to their institutionalization," as "hypothetical and unsupported." *Id.* at 31. According to Defendants, because the CDPAP Law "only switches the entities that will perform administrative tasks for consumers," and "does not require any change [as] to who performs their personal assistance services," the Consumer Plaintiffs cannot plausibly show that the transition will result in the loss of their PAs or their forced institutionalization. *Id.* at 32. Defendants also argue that the Consumer Plaintiffs' claims are not ripe because their alleged injuries are neither imminent nor concrete but rather remote and hypothetical. *Id.* at 33–34.

Plaintiffs counter that under the Freedom of Choice Provision, Plaintiffs face an actual or imminent injury in that they are "already" experiencing "fear, uncertainty, and dismay" from the upcoming transition to a Statewide FI. ECF No. 28 at 17. Plaintiffs allege that the CDPAP Law "will cause [the Consumer Plaintiffs] and approximately 280,000 other consumers to lose services on April 1, 2025[,] if each of those consumers is not successfully transitioned" to the Statewide FI by that date. *Id.* at 19.

As already explained, to satisfy the constitutional requirement of standing, one of the most important elements that federal plaintiffs must establish is that they have "suffered an injury in fact," which is "concrete and particularized and actual or imminent, not conjectural or hypothetical." *Melito*, 923 F.3d at 92.  In other words, the injury must "affect[] the plaintiff in a personal and individual way." *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (explaining that the injury-in-fact requirement is "foremost among" the factors a plaintiff in federal court must establish to satisfy Article III standing); *see also W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008) ("[T]he injury-in-fact requirement means that a plaintiff must have personally suffered an injury.").  "Moreover, 'the injury in fact test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured.'" *Id.* (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)).  "To establish standing to obtain prospective relief, a plaintiff must show a likelihood that he will be injured in the future." *Carver v. City of New York*, 621 F.3d 221, 228 (2d Cir. 2010).  "[A]llegations of possible future injury are not sufficient," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), nor is mere "past exposure to illegal conduct," *Nicholas v. Trump*, 433 F. Supp. 3d 581, 587 (S.D.N.Y. 2020).  Rather, "there must be a substantial risk that the future injury will occur, or the threatened injury must be certainly impending." *Id.*; *see also Lacewell v. Off. of the Comptroller of the Currency*, 999 F.3d 130, 141–42 (2d Cir. 2021).

Like standing, "[c]onstitutional ripeness . . . is a limitation on the power of the judiciary." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013).  Standing and constitutional ripeness "overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical." *NYCLU v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008).  Constitutional ripeness is best thought of "as a specific application of the

actual injury aspect of Article III standing." *Nat'l Org. for Marriage*, 714 F.3d at 688.  A claim "is not ripe if it depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.*  The doctrine of constitutional ripeness is designed to "prevent[] a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013).  Where, as here, Defendants' ripeness arguments and their standing arguments concern the shared requirement that Plaintiffs' injury be actual or imminent rather than conjectural or hypothetical, it is appropriate to "consider the parties' constitutional standing and constitutional ripeness challenges together." *Nat'l Org. for Marriage*, 714 F.3d at 689.

i.    The Consumer Plaintiffs' Allegations

With respect to each Consumer Plaintiff, the Complaint alleges only (1) where the Plaintiff lives, and (2) the Plaintiff's FI.  ECF No. 1 ¶¶ 15–32.  With respect to certain Plaintiffs, the Complaint also includes details about that Plaintiff's medical issues, their native language, and why they chose their current FI.  *Id.*  Beyond those Plaintiff-specific allegations, the Complaint alleges, in wholly conclusory fashion, that:  (1) the transition to "one statewide provider will result in unreasonable delays and/or loss of services . . . resulting [sic] deaths and institutionalization of home-based patients, and irreparable harm to those patients," *id.* ¶ 131; (2) that NYSDOH "has not articulated how one statewide agency can possibly serve the unique linguistic and cultural needs of 246,000 Medicaid beneficiaries" and that "[t]he inability of any one statewide agency to successfully communicate with, and address the cultural needs of, the current CDPAP beneficiary population will result in loss of services for many consumers because of their linguistic or cultural barriers, or their specific disabilities," *id.* ¶¶ 136–37; and

(3) "certain populations of beneficiaries (e.g., those with disabilities such as loss of hearing and sight)" will be affected "more significantly than others" by the alleged loss of services caused by the CDPAP Law because they rely "on localized care from agencies equipped to handle their specific needs," which "will result in forced institutionalization of Medicaid beneficiaries," *id.* ¶ 150.  Notably, the Complaint does not explain to what extent each of these proffered harms will affect any particular Plaintiff.  *See generally* ECF No. 1.

Certain of the Consumer Plaintiffs submitted declarations in support of their motion for a PI, *see* ECF Nos. 3-1–3-15, which the Court has considered in connection with the portion of Defendants' motion to dismiss brought under Rule 12(b)(1).  *See Long Island Pure Water Ltd. v. Cuomo*, 375 F. Supp. 3d 209, 215 (E.D.N.Y. 2019) (in evaluating a motion brought under Rule 12(b)(1), the Court is permitted to consider "other materials beyond the pleadings").  Plaintiff Jeannot explains that she is happy with her current FI and that if the employees at her new FI do not speak Creole, she is "afraid that [she will] end up losing [her] CDPAP services."  ECF No. 3-4 at 7.  Plaintiff Cutugno states that it is "hard to find new PAs," that the paperwork to switch from one FI to another is significant, and that she "know[s]" that her "working relationship" with one of her current PAs "**cannot** withstand" the transition to a new FI and that she "will personally lose at least one PA, if not all three."  ECF No. 3-5 at 6 (emphasis in original).  Plaintiff Francois states that she "believe[s] a single FI will ignore [her] and other CDPAP consumers" and that it is "important to [her] to choose the FI that helps [her] carry out her responsibilities."  ECF No. 3-6 at 6–7.  Plaintiffs Gittens and Dunrod state, in identical language, that "it is imperative that [they] continue to receive care" from their FI because any change to their "current care arrangement would significantly impact [their] quality of life."  ECF No. 3-7 at 2; ECF No. 3-9 at 2.  Finally, Plaintiff Gavrilov states that he does "not wish to be with any

other agency" and that he is "terrified of the idea that [his] daughter won[']t be able to continue to be [his] caregiver." ECF No. 3-11 at 3. The Court has also reviewed the declarations submitted by four PAs who care for their family members, which assert their satisfaction with their current FIs and their concerns that their family members who receive CDPAP benefits will receive diminished services under a Statewide FI. ECF No. 3-12–3-15. For example, Anna Rozenboym, the daughter of Plaintiffs Vitaliy and Margarita Rozenboym, explains that her parents, who are Holocaust survivors, chose their FI because it is run by an individual whose parents are also Holocaust survivors, which creates "a similar culture and understanding." ECF No. 3-12 at 2–3. She also extols the benefits of working with a FI that has an office in her parents' community and the Russian language skills her parents require. *Id.*[3]

<h4 style="text-align:center">ii.    The Consumer Plaintiffs' Injuries Are Speculative</h4>

Summed up generally, Plaintiffs argue that they will be injured by the CDPAP Law because the Statewide FI *may not* be able to provide the same level of care and attention, including language and cultural competence, that their current FIs provide, and because their PAs *may* choose not to transition with them to the Statewide FI. It is only then, if these potentialities come to pass, that the Consumer Plaintiffs argue they *may* receive diminished CDPAP services. Although the Court has no reason to doubt the sincerity of these concerns,

---

[3]    Plaintiffs Frimer, Islam, Dewitt, Smith, Galler, and Riofrio did not submit supplemental declarations nor did any family members submit declarations on their behalf. Because the Consumer Plaintiffs are proceeding with their claims as individuals, and not as a class, the declarations submitted by other Consumer Plaintiffs regarding their own *personal* concerns cannot help those Plaintiffs who did not submit declarations to establish that they are affected in a personal and individual way. *See Buckley v. Bassett*, No. 22-cv-01436, 2024 WL 896880, at *9 (E.D.N.Y. Mar. 1, 2024). Accordingly, those Plaintiffs who did not submit declarations are limited to the allegations in the Complaint as support for their claims for the purpose of Defendants' Rule 12(b)(1) motion, and *all* Plaintiffs are limited to the allegations in the Complaint for the purpose of Defendants' Rule 12(b)(6) motion.

they are nevertheless insufficient to establish Article III standing.  Indeed, these alleged injuries are speculative and hypothetical, and rely on a series of events that may not actually occur.  *See, e.g.*, *Clapper*, 568 U.S. at 411 (holding that a theory of standing that relied "on a highly attenuated chain of possibilities" did not satisfy "the requirement that threatened injury must certainly be impending"); *cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384, 390 (2024) (holding that the causal link between government action and the injury that allegedly gave rise to standing, which was really the "risk" of an injury or "potential[]" for an injury, was "too speculative or otherwise too attenuated to establish standing" because it was "not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs").

Plaintiffs' specific articulations of their alleged Article III injury are not convincing.  For example, the Consumer Plaintiffs assert no basis for their belief that the Statewide FI will not be able to provide similar language and culturally specific services as their current FIs—indeed, as Defendants explain, the Statewide FI is required to demonstrate "cultural and language competency specific to the population of consumers in New York."  ECF No. 26 ¶ 58 n.5 (Declaration in Support of Motion to Dismiss).  Similarly, aside from the paperwork required to switch to a new FI—which, from Plaintiffs' declarations, appears to be something that Plaintiffs and their PAs have experienced even prior to the passage of the CDPAP Law, *see* ECF No. 3-5 at 3–6—the Consumer Plaintiffs assert no plausible non-speculative basis for their fears that they will not be able to retain their PAs under the Statewide FI or that their access to services or ability to receive services promptly will be impaired.  As Defendants explain, under the CDPAP Law consumers "will continue to have the freedom and flexibility to choose their PAs," and "[t]here is nothing in the CDPAP [Law] . . . that will prevent consumers currently receiving

[CDPAP services] from continuing to receive services from the PA they have chosen under the new Statewide FI." ECF No. 26 ¶¶ 63–64. The Consumer Plaintiffs do not dispute that the CDPAP Law is devoid of any provision preventing them from continuing to receive services from their current PAs (although they argue that the transition process may cause them to lose their PAs). The Consumer Plaintiffs simply articulate no concrete or non-speculative basis for their belief that they will receive decreased quality of care under the CDPAP Law.

Indeed, Plaintiffs' Opposition couches many of the arguments that the Consumer Plaintiffs will suffer injuries in "conditional or future-oriented terms," which "undermine[s]" their contention that any alleged injury is actual and imminent. *Lacewell*, 999 F.3d at 144. For example, Plaintiffs state that the CDPAP Law will cause the Consumer Plaintiffs to lose "services" "*if* each of those consumers is not successfully transitioned" to the Statewide FI before that date," and that "*if* PAs are not successfully transitioned, they will go without timely pay for services, *leaving open the likelihood* that those PAs will need to find other work." ECF No. 28 at 19, 22 (emphases added). These hypothetical concerns—that if Plaintiffs' PAs are not able to transition to the Statewide FI in time, then Plaintiffs' prompt access to CDPAP services will be impaired—are too conjectural and based on future events that may not come to pass. *See, e.g.*, *Coffran v. N.Y.C. Pension Fund*, 46 F.3d 3, 4 (2d Cir. 1995) ("Article III court[s] cannot entertain a claim which is based upon contingent future events that may not occur as anticipated, or indeed may not occur at all."); *Davis v. Kosinsky*, 217 F. Supp. 3d 706, 712 (S.D.N.Y. 2016) (dismissing plaintiff's claims for failure to allege a sufficiently concrete injury where to credit plaintiff's assertion regarding the harms he was facing, the court would have to "engage in conjecture" and "assume" certain events would occur, which would require the court to "entangle itself in abstract disagreements over matters that are premature for review because the

injury is merely speculative and may never occur"); *Sexton v. Medicare*, 194 F. Supp. 3d 209, 215 (E.D.N.Y. 2016) (dismissing plaintiff's claims for lack of standing because he alleged "only a potential for injury that has not yet occurred and because that potential is born of nothing more than hypothesis and conjecture"). Where, as here, Plaintiffs do not "allege any nonconclusory facts of a real or immediate threat of injury," they "lack[] standing to pursue injunctive relief[.]" *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 73 (2d Cir. 2022).

   iii.  The Consumer Plaintiffs' Arguments Under the ADA and the Rehabilitation Act

  The Consumer Plaintiffs also argue that they have standing to assert their claims under the ADA and the Rehabilitation Act, based on their conclusory assertion that the CDPAP Law will result in the "institutionalization of home-based patients." ECF No. 1 ¶ 131. Plaintiffs' basis for this contention is simply that similar CDPAP transitions conducted by other states years ago allegedly resulted in some home-based patients being institutionalized.[4] ECF No. 28 at 23– 26. Even if that is the case and even if such transitions were comparable to the transition that New York will undergo (the Court notes, for example, that Pennsylvania's transition occurred more than ten years ago), not a single Consumer Plaintiff specifically alleges that they will likely face an increased *personal* risk of institutionalization as a result of the CDPAP Law, even in the most attenuated manner. *See generally* ECF No. 1; ECF No. 3.

  Interpreting *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016), a Second Circuit case that discussed, in the context of a summary judgment motion, how a plaintiff can establish a sufficient risk of institutionalization under the ADA and the Rehabilitation Act, courts in this

---

[4]  The Consumer Plaintiffs also reference the fact that Plaintiff Cutugno previously had issues with a transition from one FI to another as support for their claim that the CDPAP Law will result in their institutionalization. ECF No. 28 at 26. Plaintiff Cutugno's prior transition was not managed by the State, ECF No. 3-5 at 3–5, making the comparison inapt.

circuit have explained that "*Davis* means that [in the context of analyzing Article III standing], the injury in fact is not actual or imminent institutionalization, but rather the failure to receive services, resulting in [p]laintiff's increased likelihood of institutionalization." *M.G. v. N.Y. State Off. of Mental Health*, 572 F. Supp. 3d 1, 10 (S.D.N.Y. 2021). While in *M.G.*, the plaintiffs had sufficiently alleged that the state's "failure to provide necessary services" put them "at a substantial risk of requiring institutionalized care," *see id.*, here, as discussed, the Consumer Plaintiffs do not raise any such plausible allegations. Indeed, to assert an injury in fact, the Consumer Plaintiffs must "be [themselves] among the injured." *Buckley*, 2024 WL 896880, at *9. Absent allegations specifically asserting that any particular Consumer Plaintiff risks institutionalization as a result of a state failure to provide necessary services, the Court cannot find that Plaintiffs have alleged an injury in fact under the ADA or the Rehabilitation Act. *Cf. E.B. ex rel. M.B. v. Cuomo*, No. 16-cv-735, 2020 WL 3893928, at *6 (W.D.N.Y. July 11, 2020) (finding that plaintiffs, who alleged a state policy would lead to their institutionalization, had raised allegations that were "too tenuous" and based on a "hypothetical chain of events" and that therefore plaintiffs had "not plausibly alleged that the state's [actions] *now* will *likely* result in their institutionalization in the future").

    iv.    <u>Loss of a Statutory Right</u>

Finally, the Consumer Plaintiffs also raise a standing argument that specifically relates to the Free Choice of Provider Provision of the Medicaid Act. They allege that they "face an actual or imminent injury because the loss of that statutory right ***is itself*** an injury," *see* ECF No. 28 at 16 (emphasis in original), and because the Consumer Plaintiffs "are being stripped of their statutory right to select the agency of choice to administer their personal care services, home health aide services, and/or skilled nursing services," *see id.* at 18. However, the Supreme Court

16

explained in *TransUnion LLC v. Ramirez* that it "has rejected the proposition that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." 594 U.S. 413, 426 (2021). Rather, "Article III standing requires a concrete injury even in the context of a statutory violation," because "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III[.]" *Id.*; *see also Moreira v. Société Générale, S.A.*, No. 23-394, 2025 WL 37146, at *7 (2d Cir. Jan. 7, 2025) ("Alleging a statutory violation does not, by itself, satisfy the injury-in-fact requirement for Article III standing if the underlying injury is not sufficiently concrete."). In assessing whether a harm is sufficiently concrete for purposes of Article III, courts "should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (quoting *Spokeo v. Robins*, 578 U.S. 330, 341 (2016)).

Interpreting *TransUnion* in the specific context of suits for injunctive relief, the Second Circuit has also instructed district courts to look to whether the "bare procedural violation" alleged by a plaintiff presents "a material risk of harm to the underlying *concrete* interest Congress sought to protect." *Harty v. W. Point Realty, Inc.*, 28 F. 4th 435, 443 (2d Cir. 2022) (emphasis added). However, even with respect to suits for injunctive relief, the interest protected by Congress must be accompanied by a concrete harm to the plaintiff. *Id.* at 442–43 (affirming the dismissal of plaintiff's complaint because he failed to allege that defendant's actions "caused him concrete harm" and reiterating that "[c]oncrete injuries are physical, monetary, or cognizable intangible harms traditionally recognized as providing a basis for a lawsuit in American courts").

17

Accordingly, the mere fact that the Medicaid Act confers a right upon the Consumer Plaintiffs is not sufficient to establish Article III standing in the absence of a concrete injury or a material risk of harm to an underlying concrete interest.

As the Court has explained, the potential for physical harm that the Consumer Plaintiffs allege will flow from the loss of their FI is too speculative to satisfy this requirement. They have not shown that there is a material risk that this harm will come to pass. And the Consumer Plaintiffs point to no harm "traditionally recognized as providing a basis for lawsuits in American courts," *see TransUnion*, 594 U.S. at 425, that is analogous to the loss Plaintiffs allege of their "right to select the agency of their choice to administer their personal care services," *see* ECF No. 28 at 18. Accordingly, the Court finds that the Consumer Plaintiffs do not have constitutional standing to assert their claims because they have failed to allege a sufficient injury in fact, and their claims are dismissed without prejudice for lack of subject matter jurisdiction.

B.    *The Agency Plaintiffs*

Defendants argue that the Agency Plaintiffs lack constitutional standing to challenge the CDPAP Law because they "merely assert allegations of possible future injury" since they are allegedly free to seek a subcontract with the Statewide FI, which would allow them to continue operating after the law takes effect. ECF No. 27 at 37. Having reviewed Plaintiffs' Complaint, the Court disagrees. The Complaint plausibly alleges that none of the Agency Plaintiffs is eligible to be considered for the new Statewide FI role. ECF No. 1 ¶¶ 93–94. The Complaint also plausibly alleges that the new Statewide FI is only *required* to subcontract with a limited number of agencies that meet specific criteria and that the Agency Plaintiffs are not eligible to receive one of those subcontracts because they do not meet the criteria. ECF No. 1 ¶ 95. The Complaint also alleges that the Agency Plaintiffs will be required to "cease operations on or

before April 1, 2025," if they do not receive a subcontract. *Id.* ¶ 96.  Although the Court credits

Defendants' assertion that the Statewide FI would theoretically be free to subcontract with

additional FIs, including, possibly, the Agency Plaintiffs, such a possibility is just theoretical.

Defendants do not suggest that the Statewide FI will in fact subcontract with additional FIs, or

that the Agency Plaintiffs will be included in the group of FIs with which the Statewide FI

subcontracts.  The bottom line is that the CDPAP Law will likely put the Agency Plaintiffs out of

business.  That is enough.  *See, e.g.*, *Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 55 (2d Cir.

2016) ("Any monetary loss suffered by the plaintiff satisfies [the injury-in-fact] element; even a

small financial loss suffices.").  Accordingly, the Court finds that the Agency Plaintiffs have

asserted an injury-in-fact based on a likely future injury that is actual and imminent and not too

conjectural or hypothetical for constitutional standing.  *See Carver*, 621 F.3d at 228 ("To

establish standing to obtain prospective relief, a plaintiff must show a likelihood that he will be

injured in the future.").

Defendants argue that "in addition to pleading constitutional standing, Plaintiffs must

also satisfy 'statutory standing requirements' and show that they have a right to sue under the

laws they invoke."  ECF No. 27 at 37.  Although Defendants are correct, statutory standing

concerns "the absence of a valid . . . cause of action" and therefore "does not implicate subject-

matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case."

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014).  Because

Defendants' arguments regarding the Agency Plaintiffs' lack of statutory standing do not

implicate the Court's subject matter jurisdiction, they are more properly analyzed under Rule

12(b)(6) rather than Rule 12(b)(1).  Accordingly, the Court will address these arguments in

Section III.A., *infra*.  *See Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 128

(2d Cir. 2020) (explaining that "the Supreme Court recently clarified in its *Lexmark* decision that" issues of statutory standing determine "whether a plaintiff has a right to sue under a particular substantive law," and are "not of jurisdictional import").

*          *          *

As a result of this analysis, the only remaining claims are those asserted by the Agency Plaintiffs.  The Court is aware of the somewhat counterintuitive nature of its conclusion that the Consumer Plaintiffs do not have standing to pursue injunctive relief at this time while the Agency Plaintiffs do have such standing.[5]  As Judge Furman recently explained in *Alix v. McKinsey & Co.*, this "result may smack of a technicality."  No. 18-cv-4141, 2024 WL 3293621, at *13 (S.D.N.Y. July 3, 2024).  However, "because the defect [with the Consumer Plaintiffs' claims] goes to the Court's subject-matter jurisdiction, the Court lacks authority to reach a different disposition."  *Id.*  The Court also notes that its conclusion today does not mean that the Consumer Plaintiffs will never have a claim—in fact, they are free to pursue the very same claims they assert today in state court, where the same restrictions on Article III standing do not govern, or at a future date in federal court if and when their injuries satisfy the standing requirements discussed herein.

## II.    Application of the Eleventh Amendment

The Court must next address Defendants' arguments that three of the four Defendants— New York State, the NYSDOH, and Governor Hochul—are not proper parties to the remaining claims because they are immune from suit under the Eleventh Amendment, which also implicates this Court's subject matter jurisdiction.  *Gasparik v. Stony Brook Univ.*, 296 F. App'x 151, 152 (2d Cir. 2008).

---

[5]    Indeed, while the Agency Plaintiffs may have standing, as the Court will later determine, they have failed to state a claim for relief.  *See supra* Section III.

A.    *New York State and the NYSDOH*

Defendants argue that the Agency Plaintiffs' two Section 1983 claims, which encompass their procedural due process and Medicaid Act claims, against New York State and NYSDOH must be dismissed on sovereign immunity grounds.  ECF No. 27 at 29–30.  Plaintiffs do not respond to Defendants' arguments regarding their Section 1983 claims as to either New York State or the NYSDOH.  This alone is sufficient for the Court to deem the claims abandoned and to dismiss them without prejudice as to those Defendants.  *See, e.g.*, *Farag v. XYZ Two Way Radio Serv., Inc.*, No. 22-1795, 2023 WL 2770219, at *2 (2d Cir. Apr. 4, 2023) ("[W]e have routinely affirmed the district court's dismissal of a plaintiff's claims when the plaintiff 'did not discuss them in his opposition to the defendant's motion to dismiss.'"  (quoting *Gross v. Rell*, 585 F.3d 72, 94 (2d Cir. 2009)); *Mauro v. N.Y.C. Dep't of Educ.*, No. 21-2671, 2022 WL 17844438, at *3 (2d Cir. Dec. 22, 2022) (plaintiff abandoned a claim "by failing to oppose the motion to dismiss with respect to that claim"); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-cv-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage, . . . a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").  However, the Court will briefly address Defendants' sovereign immunity arguments for the sake of completeness.

"It is well settled that the ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."  *Clissuras v. CUNY*, 359 F.3d 79, 81 (2d Cir. 2004); *see also Murawski v. N.Y. State Bd. of Elections*, 285 F. Supp. 3d 691, 695 (S.D.N.Y. 2018) ("[I]t is well established that a non-consenting state is immune from suits brought by its own citizens in federal court.").  Eleventh Amendment immunity extends "not only to a state but also to entities considered arms of the state," which

include state agencies. *Id*. "This jurisdictional bar applies regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "It is well-established that New York has not consented to § 1983 suits in federal court, and that § 1983 was not intended to override a state's sovereign immunity." *Mamot v. Bd. of Regents*, 367 F. App'x 191, 192 (2d Cir. 2010); *accord Steinberg v. Elkman*, 666 F. App'x 26, 27 (2d Cir. 2016) ("Congress has not abrogated sovereign immunity for § 1983 claims, nor has New York waived immunity."). NYSDOH is one such entity against which claims are barred unless sovereign immunity has been otherwise abrogated. *See, e.g.*, *Grinnell v. N.Y. EPA*, No. 23-cv-1265, 2024 WL 2945718, at *7 (E.D.N.Y. June 6, 2024) (dismissing claims against the NYSDOH where the statute under which plaintiff sued did not waive the state's sovereign immunity). Accordingly, even if the Agency Plaintiffs had addressed Defendants' arguments in their reply, sovereign immunity deprives this Court of subject matter jurisdiction over their claims brought under Section 1983—their claims under the Medicaid Act and their procedural due process claim—which the Court dismisses without prejudice.

> B.     Governor Hochul

Defendants argue that those same claims against Governor Hochul under the Medicaid Act and alleging a procedural due process violation must be dismissed because Plaintiffs do not assert any substantive allegations against Governor Hochul and because she has no connection to the enforcement of the CDPAP Law. ECF No. 27 at 28–29. Plaintiffs counter that Governor Hochul took a "leading role in the creation, implementation[,] and enforcement" of the CDPAP Law, which makes her a proper defendant under *Ex parte Young*. ECF No. 28 at 12–15.

The Eleventh Amendment has been interpreted to "bar suits in federal courts against states, by their own citizens," except, pursuant to the exception set forth in *Ex parte Young*, 209

U.S. 123 (1908), "a plaintiff may sue a state official acting in his official capacity . . . for prospective injunctive relief from violations of federal law." *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007). However, "[u]nder *Ex parte Young*, the state officer against whom a suit is brought must have some connection with the enforcement of the act that is in continued violation of federal law." *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 373 (2d Cir. 2005).

Defendants are correct that the only allegations against Governor Hochul are that she is the Governor of New York, is sued in her official capacity, and maintains her office in Albany. ECF No. 1 ¶ 53. However, "[a] motion to dismiss for sovereign immunity under the Eleventh Amendment is properly brought pursuant to Rule 12(b)(1)," and in evaluating a motion brought under Rule 12(b)(1), the Court is permitted to consider "other materials beyond the pleadings." *Long Island Pure Water*, 375 F. Supp. 3d at 215. Accordingly, in evaluating whether Governor Hochul is immune from suit in this action, the Court will consider the allegations Plaintiffs raise for the first time in their Opposition to Defendants' Motion to Dismiss regarding Governor Hochul's role in the implementation of the CDPAP Law. *See* ECF No. 28 at 14–15.

Plaintiffs allege that Governor Hochul "spearheaded" the CDPAP Law and is "leading their implementation" because "[i]t was Governor Hochul and her office" that announced the selection of the new statewide FI, and Governor Hochul made other public statements that allegedly reflect "her intimate involvement in the implementation of New York's attempted move to one centralized FI." ECF No. 28 at 14. The statements Plaintiffs identify relate to Governor Hochul's assertions that the CDPAP Law "will deliver a stronger CDPAP" and that the state is "trying to right-size this program" through the CDPAP Law. *Id.*

However, "the exception under *Ex parte Young* only applies where the official sued has some connection with the *enforcement*" of the act that allegedly violates federal law. *Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. New York*, 336 F. Supp. 3d 50, 68 (E.D.N.Y. 2018) (emphasis added). Connection with the enforcement of an act that is a continuing violation of federal law "includes both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Citizens Union v. Att'y Gen.*, No. 16-cv-9592, 2017 WL 2984167, at *4 (S.D.N.Y. June 23, 2017); *see also Kelly v. N.Y. State Civil Serv. Comm'n*, No. 14-cv-716, 2015 WL 861744, at *3 (S.D.N.Y. Jan. 26, 2015) ("For a state officer to be a proper party, both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty are needed."), *aff'd*, 632 F. App'x 17, 18 (2d Cir. 2016) (holding that the district court was correct to conclude that *Ex parte Young* did not apply because the state actor against whom prospective relief was sought did not have "some connection with the enforcement of the act that violates federal law"). "The actual enforcement connection may be found in either the challenged statute itself or in the general laws of the state." *Id.* at *3.

Nowhere in their Complaint or Opposition do Plaintiffs identify any particular duty that Governor Hochul holds with respect to the CDPAP Law based on either the law itself or the general law of the state.[6] In fact, they do not identify any connection that Governor Hochul has to the CDPAP Law beyond having made general statements about her support for it. *See, e.g.*, *Grant v. Lamont*, No. 22-cv-1223, 2023 WL 5435941, at *2 (D. Conn. Aug. 23, 2023) (holding that governor's "expressed support" for the challenged regulation did "not constitute a sufficient connection under *Ex parte Young* to show that the Governor has a ***particular duty to enforce*** the

---

[6]     As Defendants explain, "[t]he CDPAP Amendment does not confer on the Governor any role in its implementation or enforcement." ECF No. 27 at 28.

laws in question" (emphasis in original)); *Nassau & Suffolk Cnty Taxi Owners*, 336 F. Supp. 3d

at 69 (dismissing claims against the governor as barred by the Eleventh Amendment when

plaintiffs failed to allege a sufficient connection between the governor and the challenged law

and no such connection was apparent from the law itself); *Goldstein v. Hochul*, 680 F. Supp. 3d

370, 384 (S.D.N.Y. 2023) ("The Governor's general duty to execute the laws is not sufficient to

make her a proper party in a suit challenging a state statute."); *Kuck v. Danaher*, 822 F. Supp. 2d

109, 142 (D. Conn. 2011) ("[C]ourts in the Second Circuit have not extended the exception

under *Ex parte Young* on the basis that a state official has a general duty to execute and enforce

state laws."); *Chisholm v. Kevins*, No. 23-cv-5169, 2024 WL 3328592, at *5 (E.D.N.Y. July 8,

2024) ("[M]erely alleging that an official has the general duty to enforce or execute the law is

insufficient to overcome Eleventh Amendment immunity."); *Conn. Ass'n of Health Care

Facilities, Inc. v. Rell*, No. 10-cv-136, 2010 WL 2232693, at *5 (D. Conn. 2010) ("Holding that

a state official's obligation to execute the laws is a sufficient connection to the enforcement of a

challenged statute would extend [*Ex parte*] *Young* beyond what the Supreme Court has intended

and held.").  Accordingly, the Court agrees with Defendants that Governor Hochul lacks the

requisite connection to the enforcement of the CDPAP Law contemplated by *Ex parte Young* and

that the Agency Plaintiffs' claims against her under the Medicaid Act and for a due process

violation must be dismissed without prejudice.[7]

---

[7]    Plaintiffs ask the Court for "leave to amend as necessary" if it finds that they have not
alleged sufficient facts regarding Governor Hochul's implementation of the CDPAP Law.  As an
initial matter, a bare request for leave to amend that does not state what additional facts Plaintiffs
might allege in an amended pleading does not entitle Plaintiffs to leave to amend.  *See In re
Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011) (finding no abuse of
discretion where the "plaintiffs requested leave to amend without specifying what additional
facts, if any, they might assert in a new pleading"); *Singh v. Shikan*, No. 14-cv-5450, 2015

*                *                *

As a result of this analysis, the remaining claims are (1) the Agency Plaintiffs' Medicaid

Act claim against Defendant James McDonald in his official capacity as Commissioner of the

NYSDOH, and (2) the Agency Plaintiffs' due process claim against McDonald in his official

capacity.  The Court will now analyze Defendants' Rule 12(b)(6) motion as to each of these

claims.

### III.    Defendants' Rule 12(b)(6) Motion to Dismiss

Having resolved the constitutional standing and immunity-related issues raised in

Defendants' Motion, the Court will address the Agency Plaintiffs' remaining claims.  Both of the

Agency Plaintiffs' remaining claims are brought under Section 1983, which "is not itself a

---

WL 4111344, at *1 (S.D.N.Y. June 25, 2015) (describing denial of leave to amend based on a
"one[-]sentence, boilerplate request").

And, "[w]here a proposed amendment would be futile, leave to amend need not be
given." *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011).  "Futility is a determination, as a
matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim
under Rule 12(b)(6)." *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 175 (2d Cir. 2021).
Here, because the Court has determined that the Agency Plaintiffs' claims against Governor
Hochul are barred by Eleventh Amendment immunity, the proposed amendment would be futile.
*See Yerdon v. Poitras*, 120 F.4th 1150, 1157 (2d Cir. 2024) (denying leave to amend as futile
when sovereign immunity barred plaintiff's official capacity claims against defendants); *Mitchell
v. New York*, No. 23-705, 2024 WL 319106, at *2 (2d Cir. Jan. 29, 2024) (holding that
amendment would be futile because plaintiff's claims against defendant were "barred by the
Eleventh Amendment"); *Jacobs v. Jacobs*, No. 22-2846, 2023 WL 4503766, at *3 (2d Cir. July
13, 2023) ("Leave to amend would [] have been futile, as [plaintiff's] claims are barred by
Eleventh Amendment immunity.");  *Jackson v. Cnty. of Nassau*, No. 07-cv-245, 2009 WL
393640, at *4 (E.D.N.Y. Feb. 13, 2009) (Bianco, J.) (denying leave to amend as futile because
the proposed defendants were immune from suit under the Eleventh Amendment).

Additionally, amendment is futile where the issues with the causes of action are
"substantive." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  Here, even if Plaintiffs
could somehow plead their way around Governor Hochul's Eleventh Amendment Immunity, the
same issues the Court has identified that require the dismissal of the Agency Plaintiffs' claims
against Defendant McDonald under Rule 12(b)(6), *see infra* Section III, would apply with equal
force to any claims the Agency Plaintiffs might be able to assert against Governor Hochul.
Accordingly, any amendment would be futile.

source of substantive rights," but "merely provides a method for vindicating federal rights elsewhere conferred." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). Defendants argue that the Agency Plaintiffs' claims under the Medicaid Act and their claims alleging a violation of their due process rights must be dismissed on substantive grounds for failure to state a claim. ECF No. 27 at 37–41, 53–54. Defendants argue, *inter alia*, that the Agency Plaintiffs cannot show that they have a right to sue under the laws they invoke, *see* ECF No. 27 at 37, and do not possess a property or liberty interest implicating due process, *see id.* at 53. Plaintiffs do not address either of these arguments in their opposition, putting all their eggs into the basket of defending the claims asserted by the Consumer Plaintiffs. *See generally* ECF No. 28. This wholesale failure to respond to Defendants' arguments regarding the Agency Plaintiffs' remaining claims is alone sufficient for the Court to find that Plaintiffs have abandoned those claims. *See, e.g.*, *Farag*, 2023 WL 2770219, at *2. However, the Court will briefly address the merits of each claim to explain why Defendants are correct that they must indeed be dismissed for failure to state a claim.

> A.  *The Agency Plaintiffs' Claims Under the Freedom of Choice Provision of the Medicaid Act*

Defendants argue that the Agency Plaintiffs do not satisfy the requirements of statutory standing because they do not have a right to sue under the Freedom of Choice Provision of the Medicaid Act. Beyond constitutional standing, a plaintiff must establish that the statute under which the plaintiff is suing "grants the plaintiff the cause of action that he asserts." *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 196–97 (2017). To determine whether a plaintiff has such statutory standing, courts presume that a statute "provides a cause of action only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 197. This

analysis requires a court to "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.*

In the Complaint, the Agency Plaintiffs argue that the CDPAP Law violates the Medicaid Act's Freedom of Choice Provision because they have a "right to be included among the [FIs] by which Plaintiff Consumers may select to administer their CDPAP services." ECF No. 1 ¶ 154. Beyond this bald assertion, the Agency Plaintiffs identify nothing in the Medicaid Act setting forth such a right. That is not surprising. As Defendants explain, the plain language of the Freedom of Choice Provision explicitly guarantees *Medicaid beneficiaries*—not FIs—the right to obtain medical assistance "from any institution, agency, community, pharmacy, or person qualified to perform the service or services required[.]" 42 U.S.C. § 1396a(a)(23)(A). This reading of the provision is supported by the Senate Report that accompanied the provision, which stated that the provision "would allow *recipients* free choice of qualified providers of health services and that people covered under the Medicaid program would have free choice of qualified medical facilities and practitioners." *See Nutritional Support Servs., L.P. v. Miller*, 826 F. Supp. 467, 470 n.4 (N.D. Ga. 1993) (emphasis added). This alone dooms the Agency Plaintiffs' claim.

Defendants also argue that because, as the terms are defined in the Medicaid Act, FIs do not provide the types of care and services that constitute medical assistance, they do not fall within the zone of interests of the Freedom of Choice Provision. ECF No. 27 at 38–39, 41–43. Indeed, the Freedom of Choice Provision specifically states that "any individual eligible for medical assistance," "may obtain such assistance from any institution, agency, community, pharmacy, or person qualified to perform the service or services required[,] . . . who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23). Section 1396d(a) further explains that

"medical assistance means payment of part or all of the cost of the following care and services or the care and services themselves, or both[.]"  The specified types of "care and services" include:

> [O]utpatient hospital services[,]. . . laboratory and X-ray services[,] . . . home health care services[,] . . . private duty nursing services[,] . . . physical therapy and related services[,] . . . hospice care[,] . . . case management services[,][8] . . . home and community care[,] . . . community supported living arrangements services[, and] . . . personal care services furnished to an individual who is not an inpatient or resident of a hospital, nursing facility, intermediate care facility for the mentally retarded, or institution for mental disease[.]

*Id.* § 1396d(a).  Defendants argue that this enumerated list plainly does not include the kinds of work that FIs, "which act as third-party intermediaries and provide administrative services such as wage and benefit processing," carry out.  ECF No. 27 at 41.

Plaintiffs counter that FIs "facilitate the provision of ***personal care services***[,] . . . which are unquestionable [sic] 'medical assistance.'"  ECF No. 28 at 32 (emphasis in original). Plaintiffs also argue that even if the Court finds that FIs do not provide personal care services, they are "still . . . the agency that pays the PAs for those services" and the term "medical assistance" includes "not just the care and services themselves but also payment of part or all of the cost of" the specified medical services, including personal care services.  *Id.* at 33–34.

The Court agrees with Defendants that, under a plain reading of the statute, FIs are not providers of personal care services.  The Agency Plaintiffs appear to concede that they do not actually provide personal care services but argue that they are somehow covered by the Medicaid Act because they "facilitate" the provision of those services.  *Id.* at 32.  The Medicaid Act defines "medical assistance" as the provision of personal care services (*i.e.*, the services that PAs

---

[8]      Plaintiffs concede that they are not alleging that FIs provide "case management services." ECF No. 28 at 31 n.3.

provide to the Consumer Plaintiffs), not as *facilitating* the provision of personal care services. *Cf. Williams ex rel. United Guardianship Servs. v. Shah*, No. 12-cv-3953, 2014 WL 1311154, at *7 (E.D.N.Y. Mar. 30, 2014) (finding that although Section 1396d(a) lists nursing services as a type of care or service that constitutes medical assistance and "legal guardians may assist with securing nursing facility services," legal guardianship services do not constitute medical assistance because the Medicaid Act "gives no indication that guardians' services are themselves a component of [the care provided by nursing facilities]").  Accordingly, as the Agency Plaintiffs themselves seem to concede, they do not provide personal care services as defined under the Medicaid Act.

As for the Agency Plaintiffs' argument that they are providers of medical assistance because they distribute payments to the Consumer Plaintiffs' PAs for the personal care services provided by those PAs, the Court is not convinced.  Although no court in this circuit appears to have addressed this specific issue, the Ninth Circuit has characterized "medical assistance" under the Medicaid Act as "a statutory term of art that means payment" and explained that the "payment" portion of that definition refers to the "funds" that are "to be spent in payment of part or all of the cost" of providing the specified services to individuals.  *Univ. of Wash. Med. Ctr. v. Sebelius*, 634 F.3d 1029, 1034 (9th Cir. 2011); *cf. O.B. v. Norwood*, 838 F.3d 837, 843 (7th Cir. 2016) (explaining that in enacting Section 1396d(a) of the Medicaid Act, Congress intended that "*a participating State*" was both required to pay for the specified services and to provide them (emphasis added)).  The Ninth Circuit's reading of "medical assistance" is supported by the legislative history of the definition.  The House Committee Report from the session that recommended amending the Medicaid Act to implement the current definition of "medical assistance" states that the Act's use of "payment" has "been understood to refer to both *the funds*

30

*provided to pay for care and services* and to the care and services themselves." H.R. REP. No. 111-299, pt. 1 at 649 (2009) (emphasis added). As Defendants explain, although FIs *distribute* the funds to PAs, they do not actually provide those funds themselves—they receive funds from the state's Medicaid program and ensure that those funds go to the appropriate providers. Their role as facilitators does not make FIs the entities that *actually provide* the funds for the services that consumers receive. This conclusion is supported by the multiple courts that have understood the payment provision of this definition to refer to the *state's* provision of funds to cover services provided to Medicaid beneficiaries. *See, e.g.*, *Bontrager v. Ind. Fam. & Soc. Servs. Admin.*, 829 F. Supp. 2d 688, 699 (N.D. Ind. 2011); *Carter v. Gregoire*, 672 F. Supp. 2d 1146, 1150 (W.D. Wash. 2009); *A.H.R. v. Wash. Health Care Auth.*, 469 F. Supp. 3d 1018, 1040–41 (W.D. Wash. 2016). Accordingly, the fact that FIs facilitate the payment of the Consumer Plaintiffs' PAs does not bring them within the Medicaid Act's definition of "medical assistance."[9]

The Freedom of Choice Provision allows consumers to obtain medical assistance from any qualified entity that "provide[s]" medical assistance. 42 U.S.C. § 1396a(a)(23). Thus, the Court's conclusion that FIs do not provide medical assistance requires the Court to conclude that FIs do not fall within the zone of interests of the Freedom of Choice Provision. Indeed, Courts

---

[9]    The Court dismissed the Consumer Plaintiffs' claims for lack of standing, *see supra* Section I.A., and so did not reach Defendants' Rule 12(b)(6) arguments as to those Plaintiffs. However, the Court notes that its conclusion that FIs are not providers would have led to the dismissal of the Consumer Plaintiffs' claims under the Freedom of Choice Provision of the Medicaid Act under Rule 12(b)(6) even if they had been able to establish standing. Plaintiffs argue that they state a claim under the Freedom of Choice Provision of the Medicaid Act because FIs provide medical assistance, and they are being deprived of their right to choose their FI. ECF No. 28 at 31–35. That argument is of course foreclosed by the Court's conclusion here. To the extent that the Consumer Plaintiffs' claims under the Reasonable Promptness and Comparability Provisions are also premised on the loss of their FIs (in the portion of their Opposition addressing these claims, Plaintiffs repeatedly reference "impacts on services" and the loss of "services" without clarifying what specific services they are referring to), *see* ECF No. 28 at 37–38, those arguments would also necessarily fail.

addressing the zone of interests of the Freedom of Choice Provision have been clear that even entities that do provide medical assistance "are not within the 'zone of interests' intended to be protected by the [Freedom of Choice Provision]," which was intended to protect consumers. *Cmty. Cnty. Day Sch. v. Sch. Dist. of the City of Erie*, No. 14-cv-19, 2014 WL 3535341, at *9 (W.D. Pa. July 16, 2014), *aff'd*, 618 F. App'x 89 (3d Cir. 2015); *see also Catanzano v. Wing*, 992 F. Supp. 593, 595 (W.D.N.Y. 1998) (holding that "the legislative history" of the Freedom of Choice Provision "indicates that it is intended to confer rights upon health care recipients, not providers"); *cf. Transitional Servs. v. N.Y. State Off. of Mental Health*, 91 F. Supp. 3d 438, 444 (E.D.N.Y. 2015) (discussing the Medicaid Act generally and stating that Medicaid recipients are "the true beneficiaries of the [Medicaid Act]").  If even providers of medical assistance do not fall within the zone of interests of the Freedom of Choice Provision of the Medicaid Act, the Court does not see how FIs, which are not providers of medical assistance, can do so.  Accordingly, the Agency Plaintiffs' claims under the Freedom of Choice Provision must be dismissed with prejudice.

Defendants also argue that the Agency Plaintiffs lack a private right of action to enforce the Freedom of Choice Provision under Section 1983.  Section 1983 "is enforceable only for violations of federal rights, not merely violations of federal laws."  *Torraco v. Port Auth.*, 615 F.3d 129, 136 (2d Cir. 2010).  For the Freedom of Choice Provision to create a private right enforceable under Section 1983, "Congress must have intended that [it] benefit the plaintiff."  *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).  For the Court to determine that Congress "unambiguously conferred" "individual rights upon a class of beneficiaries" that includes the Agency Plaintiffs, they must show *more* than that they "fall within the general zone of interest[s] that the statute is intended to protect."  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002); *see*

*also N.Y. State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 78 (2d Cir. 2019) (holding that to show that Congress intended a provision in question to benefit a plaintiff, the plaintiff must show "more than" that they "fall[] within the general zone of interest that the statute is intended to protect").  Here, where the Court has already determined that the Agency Plaintiffs are not within the zone of interests that Congress intended to protect by the Freedom of Choice Provision, the Agency Plaintiffs have necessarily failed to show that they meet this more demanding standard, and their claims under the Freedom of Choice Provision must be dismissed.

### B.    The Agency Plaintiffs' Due Process Claims

As an initial note, the Agency Plaintiffs' wholesale failure to respond to Defendants' arguments regarding their due process claims make it difficult for the Court to determine the contours of these claims, which are sparsely pled in the Complaint.

To the extent the Agency Plaintiffs are arguing that the CDPAP Law violates their due process rights by excluding them from being among the FIs that the Consumer Plaintiffs can select to administer their CDPAP benefits, such a claim must fail because the Agency Plaintiffs do not possess a constitutionally protected property interest conferred by the relevant section of the Medicaid Act.  Procedural due process protections only attach "where state or federal law confers an entitlement to benefits," and that "[a] mere unilateral expectation of receiving a benefit is not" enough because "a property interest arises only where one has a legitimate claim of entitlement to the benefit." *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005).  It is well settled that "a Medicaid provider has no property right to continued enrollment as a qualified provider." *Necula v. Conroy*, 13 F. App'x 24, 26 (2d Cir. 2001).  If even entities that provide medical assistance under the Medicaid Act do not have such a property right, it is not apparent to

the Court how FIs, which do not provide medical assistance, could possess such a right. Accordingly, under this theory, the Agency Plaintiffs have failed to state a due process claim.

It appears from the Complaint that the Agency Plaintiffs may also be asserting that their procedural due process rights were violated because Defendants passed the CDPAP Law without seeking a waiver from the Centers for Medicare and Medicaid Services ("CMS"), which is required to approve certain changes to state Medicaid plans. ECF No. 1 ¶¶ 102–09. Plaintiffs allege that such a waiver was necessary—a conclusion of law with which Defendants disagree—and that by failing to seek the waiver, Defendants circumvented the notice and comment period that would have been required had the waiver been sought. *Id.*; *see also* ECF No. 27 at 46–48. Assuming, for the sake of argument, that such a waiver should have been sought, courts have held that healthcare providers "do not have a private right of action to enforce the federal Medicaid statute's state plan approval requirement" because "there is no indication that Congress intended the approval provision to confer a private right of action to health care providers." *N.J. Primary Care Ass'n Inc. v. N.J. Dep't of Hum. Servs.*, 722 F.3d 527, 538 (3d Cir. 2013); *Cmty. Health Care Ass'n v. Shah*, 770 F.3d 129, 148 n.2 (2d Cir. 2014) (citing to *N.J. Primary Care Ass'n*, and explaining that "we note, though we need not hold, that there is likely no such cause of action" for a healthcare provider to challenge a state's failure to seek CMS approval for a change in the state's Medicaid plan). As discussed herein, FIs have an even more attenuated relationship to the Medicaid Act than providers of medical assistance. Accordingly, even under this theory, the Agency Plaintiffs' due process claim fails and must be dismissed with prejudice.

*                    *                    *

Therefore, even if the Agency Plaintiffs had addressed Defendants' Rule 12(b)(6) arguments regarding their claims—which, as discussed, they did not, *see supra* at 27—the Court

would still conclude that the Agency Plaintiffs fail to state a claim under either the Medicaid Act or for a due process violation.

### IV.    Plaintiffs' Preliminary Injunction Motion

Having dismissed the Consumer Plaintiffs' claims without prejudice for lack of standing and the Agency Plaintiffs' claims without prejudice based on sovereign immunity or with prejudice for failure to state a claim, the Court now finds that Plaintiffs' motion seeking a preliminary injunction must be denied as moot.  *See, e.g.*, *Marcel v. Donovan*, No. 11-cv-1560, 2012 WL 868977, at *6 (E.D.N.Y. Mar. 14, 2012) (denying plaintiff's preliminary injunction motion as moot and holding that he could not establish the likelihood of success on the merits necessary for the grant of a preliminary injunction after the court granted defendants' motion to dismiss); *Young Advocs. for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 238 (E.D.N.Y. 2019) (denying plaintiff's motion seeking a preliminary injunction without analysis after finding that plaintiff lacked standing); *Miller v. McDonald*, 720 F. Supp. 3d 198, 218 (W.D.N.Y. 2024) (denying plaintiffs' motion seeking a preliminary injunction as moot because "[t]he [c]ourt's determination that [p]laintiffs' claims must be dismissed eliminates any possibility that the [c]ourt could grant their request for preliminary injunctive relief"); *Kearns v. Cuomo*, 415 F. Supp. 3d 319, 326 (W.D.N.Y. 2019), *aff'd*, 981 F.3d 200 (2d Cir. 2020) ("[I]f [p]laintiff's lawsuit does not survive [d]efendants' motion to dismiss, then [plaintiff] is not entitled to any relief—injunctive or otherwise.").  Indeed, as it relates to standing, the Second Circuit approved this approach only a few days ago, explaining that district courts "*cannot* consider the merits of [a] preliminary injunction motion and should dismiss [a] claim altogether" if they determine that a plaintiff's legal theory "doom[s] the plaintiff's standing."  *Do No Harm v. Pfizer Inc.*, No. 23-15, 2025 WL 63404, at *8 (2d Cir. Jan. 10, 2025) (emphasis in original).

## CONCLUSION

Accordingly, for the reasons stated herein, Defendants' Motion to Dismiss, *see* ECF No. 27, is GRANTED and Plaintiffs' Motion for a PI, *see* ECF No. 3, is DENIED.  The Consumer Plaintiffs' claims are dismissed without prejudice for lack of subject matter jurisdiction; the Agency Plaintiffs' claims against Governor Hochul, New York State, and NYSDOH are dismissed without prejudice based on Eleventh Amendment sovereign immunity; and the Agency Plaintiffs' claims against James McDonald in his official capacity are dismissed with prejudice for failure to state a claim.  The Clerk of Court is respectfully directed to enter judgment and to close this case.

SO ORDERED.

 */s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
       January 13, 2025